**DANDRIDGE v. FIDELITY & CASUALTY CO. OF NEW YORK et al. (EMPLOYERS LIABILITY ASSUR. CORPORATION, Limited, Intervenor).**

No. 5905.

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1939.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellants.

Kennon & Kitchens, of Minden, and Foster, Hall, Barret & Smith, of Shreveport, for appellees.

DREW, Judge.

Mrs. Martha Pugh Dandridge, individually and as tutrix of her minor child,

filed suit against J. K. Watkins and William C. Hines, both employees of the United Gas Public Service Company, and the Fidelity & Casualty Company of New York, the said company's public liability insurer of a truck driven by its said employees, claiming damages in the sum of $55,355, for the death of plaintiff's husband, Ben U. Dandridge, who was the father of the minor, Catherine Dandridge. Subsequently, she filed suit against the United Gas Public Service Company, United Gas Corporation, Union Production Corporation, Union Producing Company, United Gas Pipe Line Company, J. K. Watkins, William C. Hines and Carl Bigby, for damages for the death of Ben U. Dandridge, and prayed for judgment in the same amount as in the former suit. The two cases were consolidated for trial.

During the trial, nonsuit was entered as to all defendants except United Gas Public Service Company and its successor, Union Producing Company, and the Fidelity & Casualty Company of New York. The Employers' Liability Assurance Corporation, Ltd., intervened in the consolidated suits to recover the amount of compensation it had paid plaintiff for the death of her husband, and to be relieved from any further payments.

The lower court rendered judgment for plaintiff in the amount of $20,355, with legal interest from judicial demand, against the three remaining defendants in solido. The liability of the Fidelity & Casualty Company of New York was limited to $5,000, the amount of coverage provided by its policy. It also awarded judgment for intervenor and against the three defendants, in solido, in the amount of $247, for medical and funeral expenses. It further ordered that intervenor recover out of the principal award to plaintiff the amount of compensation it had paid to plaintiff, together with $600 as attorney's fees, and relieving intervenor from further compensation payments. From this judgment, all three defendants prosecute this appeal. Plaintiff has answered the appeal, praying that the amount of the award be increased.

The United Gas Public Service Company, hereafter spoken of as United Gas Company, is one of the large production companies of oil and gas in North Louisiana. It was, during the year 1936, engaged extensively in drilling wells in search of oil and gas. On December 15, 1936, it was setting up or rigging up to drill a well in the Sligo field of Bossier Parish, Louisiana. A battery of three boilers was to be used in drilling the well. They had been put in place. After being placed, it was necessary to put on them the smoke stacks, which were approximately sixteen feet in height and weighed about 600 pounds. The stacks were hoisted into position, to be fitted onto the boilers, by the use of an A-frame or "gin poles", which were attached to the rear end of a truck. The cable on the "gin pole" was attached to the stacks about midway of them. The end of the stack which fitted onto the boiler being the heavier, caused the stack to stand up straight. The other end of the cable was attached to a windlass which was operated by the engine of the truck. The record shows that this is the customary and approved manner of handling smoke-stacks in the oil field. It is also shown that when the ground is wet or soft, planks or other lumber were placed on the ground to give a solid footing for the truck wheels.

On this particular day, in the manner above described, the smokestacks had been set on boilers number one and two, with nothing unusual happening. When the truck, with the stack for the number three boiler suspended in the air from the "gin pole", was backing up to the number three boiler, one of the rear wheels of the truck slipped off the planks which had been placed to give the truck solid footing. This caused the suspended smokestack to swing to and fro. It struck the number two smokestack or guy wire holding it, causing it to fall and strike the stack or wire holding the number one stack, in turn causing it to fall. The number one stack fell on Ben U. Dandridge, who was at the time, or had been just prior thereto, welding the mud rim on the number one boiler. Dandridge was severely injured. He was taken to the sanitarium immediately, where he died three days later.

Defendants contend that the ground underneath the lumber gave way, causing the wheel to slip off the planks; that the employees of United Gas Company could not reasonably have anticipated the danger, as the ground had the same appearance of that which did not give way when the stacks were placed on boilers numbers one and two, the three boilers being in close proximity to each other; and that therefore there was no negligence on the part of the United Gas Company.

The record discloses, or, at least, fails to disclose, that any precautions were taken by the employees of the United Gas Company to avert the accident which happened. They knew Mr. Dandridge was working on boiler number one. They also knew, or should have known, that if the truck got out of balance the stack would swing to and fro and would likely strike the other smokestacks, which were so close by. It was their duty to have examined the ground and to have so placed the planks as to prevent the wheel from slipping off. The driver of the truck should have used extra care in keeping his truck wheels on the plank. Yet he testified that he backed the truck onto the planks without looking at them. It is very clear that the truck driver took no precaution at all to try to keep the truck wheels on the planks.

The necessary precaution and care required by law under the circumstances was not taken by the employees of the United Gas Company, and the failure in this respect was negligence and the proximate cause of the accident. Plaintiff is entitled to recovery in this case for the death of her husband and the father of her child, unless we find the employment of the deceased was at the time of the accident such as to be covered by the Employers' Liability Act of this state (Act No. 20 of 1914, as amended).

Defendants seriously contend that Mr. Dandridge's employment was covered by the Employers' Liability Act. It is well settled that if plaintiff could have recovered under said act, that she has no cause of action under Article 2315 of the Revised Civil Code.

Section 34 of Act No. 20 of 1914, as amended by Section 1 of Act No. 38 of 1918, provides that the rights and remedies granted to an employee and his dependents on account of personal injuries for which he is entitled to compensation under the act, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, relations, or otherwise on account of such injuries.

Paragraph 1 of Section 6 of Act No. 20 of 1914, as amended, provides as follows:

"That where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or his dependent any compensation under this act which he would have been liable to pay if that employee had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal, then, in the application of this act, reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed." (As amended by Act No. 38, Session Acts of 1918; and by Act No. 85, Session Acts of 1926).

It therefore follows that if the work contracted for is within the trade, business and occupation of defendant, or is within the category of operations, it may not be contracted for except under the conditions imposed by Section 6 of the Act. However, a general employer or principal may, without retaining liability to the employees of an independent contractor, employ such independent contractor to do such special work as is not generally done directly by others engaged in the same line of business as is the principal,—such as special construction or even such unusual repairs as are ordinarily made by specialists not customarily within the direct employ of the principal. Horrell v. Gulf & Valley Cotton Oil Co., Inc., 15 La.App. 603, 131 So. 709; Seabury v. Arkansas Natural Gas Corporation, 171 La. 199, 130 So. 1.

In the Horrell v. Gulf & Valley Cotton Oil Company case, supra, the court discussed a case from the Michigan court, as follows [15 La.App. 603, 131 So. 713]:

"In Burt v. Munising Woodenware Co. et al., 222 Mich. 699, 193 N.W. 895, the general employer entered into a contract with an independent contractor under which the latter undertook to repair a boiler in the manufacturing plant of the general employer. It was held that the employee might seek compensation directly from the general employer. While this case appears to squarely support the contention of defendant, it is possible that on two grounds it may be distinguished from the case at bar. In the first place, the work being done was manifestly nothing

but repair work on a piece of equipment already installed, and there is nothing to show that that repair work may not have been done by the employees of the general employer himself, and, furthermore, the Michigan statute, though somewhat similar to that which we are now considering, was plainly much broader in its terms, and was not limited in this regard to such work as is part of the trade, business, or occupation of the principal."

The facts in the case at bar make it clear that the work being done by the deceased was repair work on equipment already installed, and the testimony shows without contradiction that the repair work may have been and could have been done by the regular employees of the employer itself.

The facts as to the deceased's employment are as follows: S. I. Blake was engaged in the welding business. One of his employees, known as "Shorty" Smith, had some time prior thereto seen Dewey Goodman and asked for the job of welding which was necessary in setting up the rig. Dewey Goodman was in charge of the well on the day Dandridge was injured. He telephoned to "Shorty" Smith, who was in Cotton Valley, Louisiana, to send a welder to the job, and Dandridge reported on the morning of December 15, 1936. There was no other contract between United Gas Company and S. I. Blake. The price was not stipulated or discussed, it being generally understood that a price of $4 per hour was the customary price for a welder and his implements. Neither Blake, Smith nor Dandridge knew, when Dandridge went on the job, just what welding was to be done. Smith was not instructed as to what kind of welding outfit to send. As was customary, he sent both acetylene and electric, and, as testified by one engaged in the same line of work, if he had not sent both Dandridge would not have been allowed to stay on the job very long.

Dandridge was to do any and all welding he was directed to do by Goodman, or in his absence, the driller in charge. As to what welding he was to do and when and how he was to do it, he received instructions directly from the driller on duty at the time. Any failure on the welder's part to carry out the orders of the driller subjected him to being immediately sent away from the job. There was no obligation on the part of the driller or other employees of United Gas Company to give any notice of the welder's discharge from the job to S. I. Blake or his employee, Smith. It could have called one of its own welders or secured another outside welder to finish the job, without being guilty of any violation of contract with S. I. Blake or "Shorty" Smith, if Dandridge had failed to obey the orders of the driller in charge.

Dandridge was to receive pay only for the hours he worked, and S. I. Blake, who furnished the welding outfits, both acetylene and electric, was to receive pay the same way. The customary price of $4 per hour covered the use of welding outfits and the services of the welder. The fact of whether Dandridge was paid by Blake or by the United Gas Company can have little or no bearing on the case.

After Dandridge came on the job, he was instructed to weld some three-inch nipples and some connections. He did this, using an acetylene welding outfit. He was then instructed to repair, by welding, the mud rim on boiler number one to stop a leak. He used an electric welding machine on this job. The boiler was then in place, with the smokestack up. It was while performing this duty that he was injured.

The United Gas Company is engaged in the business, trade or occupation of drilling for, producing, transporting, and selling oil and gas. Its operations are large. It maintains its own land department, production department, maintains and operates its own transportation department of pipe lines, which it constructs, and maintains its own sales department. It has in its employ men to fill the necessary jobs in each department. Among these employees are six or eight welders capable of using either acetylene or electric welding machines. It owns and makes use of both acetylene and electric welding outfits. Whenever it was possible, or not too inconvenient, one of its regularly employed welders would do the necessary welding in setting up a drilling outfit. It is clearly shown that there is always and in every case a certain amount of welding to be done in setting up a drilling outfit consisting of boilers, water lines, etc. There is not as much welding necessary on boilers as on other parts of the equipment, but it is not unusual for some part of a boiler to be welded. This is shown by the evidence, as well as by the fact that the deceased in this case had, only a short time before, welded the mud rim on one of United Gas

Company's boilers on a nearby lease to the one he was working on when injured.

The welding is always done on the lease and usually, as in this case, after the boilers have been set and ready for use other than the repairs to be made by welding. When it is not convenient, or all regularly employed welders are busy elsewhere for the company, an outside welder is employed. It is usually done, as in this case, by instructing someone engaged exclusively in the welding business to send a man to do the necessary welding in setting up of the rig.

At the time of the injury to deceased, the United Gas Company was operating extensively in the Rodessa field of Caddo Parish, and all of its welders were in that locality. Its operations in the Sligo field of Bossier Parish were small compared to those in the Rodessa field. It had no regularly employed welder in the Sligo field. It was more convenient, and no doubt much more economical, to call in an outside welder than to wait for or attempt to secure one of its own welders who might be busy elsewhere. One of the United Gas Company's drillers testified that if he did not use one of the company's regular welders when convenient to secure him, he would be called on to explain why to those in authority.

Plaintiff's counsel stress the fact that at the time Mr. Dandridge was injured he was engaged in electrical welding, and not acetylene welding, and therefore it was special work; and that United Gas Company did not, in the regular course of its business, do any electrical welding. The lower court fell into this same error, and based its judgment thereon. Both the counsel and the lower court overlooked the uncontradicted testimony in the record by several witnesses, and one from whom the lower judge elicited the information himself by asking the questions, that the United Gas Company had in its employ six or eight welders who were capable of using and did use both acetylene and electrical welders, and that the company owned and operated both kinds of equipment.

They further overlooked the established fact that on the day Mr. Dandridge was injured he was engaged in work which required the use of both electric and acetylene welders. He had just finished using an acetylene welder to weld some three-inch nipples and some connections. It is shown that one of the "roughnecks" employed a short time before by the United Gas Company had been also used as an acetylene welder and had performed the necessary welding services in setting up a drilling outfit in the Sligo field. If there was any merit in the contention that electric welding was special work, under the facts in this case it loses its force when we find that Mr. Dandridge, under his employment, was doing both kinds of welding on the day he was injured. He had no separate contract for electric welding. He was employed to do any and all welding ordered done by the driller in charge. The price per hour was the same for all kinds of welding required to be done by him.

It is therefore not sound reasoning to say that if Mr. Dandridge had been injured while doing acetylene welding he could not recover under Article 2315 of the Revised Civil Code, but if he was injured a few minutes afterwards while doing electric welding he could recover, although there was no separate or special contract governing the two kinds of welding to be done.

A part of the business, trade and occupation of the United Gas Company was the drilling of wells in search for oil and gas. The setting up of the machinery and equipment with which to drill was necessary in order to drill, and minor repairs by welding of and on the equipment was likewise necessary every time it was set up. It is so closely related to the actual drilling of the well as to become a component part of it and, to our minds, clearly is a part of the business, trade and occupation of the United Gas Company and is a part of its operation.

This court and the Supreme Court held in the case of Seabury v. Arkansas Natural Gas Company, supra, that the hauling of pipe to be used in the drilling of an oil well was a part of the trade, business and occupation of the defendant company, and the driver of a truck hauling pipe for an independent contractor was entitled to recover compensation from the defendant, the employer of the independent contractor. We will refrain from discussing the question of whether or not, under the facts of this case, S. I. Blake was an independent contractor. A discussion is not necessary, since we have found that Mr. Dandridge, at the time of the accident, was covered by Section 6 of the Employers' Liability Statute of this state, even though

Blake could be held to be an independent contractor; and that the right of action of Mr. Dandridge's dependents for his death is under that act and they cannot recover under Article 2315 of the Revised Civil Code.

Plaintiff contends that even though she is not entitled to recover under the tort action, she is entitled to recover against the Fidelity & Casualty Company of New York under the policy of public liability insurance which defendant, United Gas Company, admits it carried and the casualty company admits it issued to cover damages caused by the truck involved in this accident, through negligence on the part of the United Gas Company's employees.

In the case of Ruiz v. Clancy, 182 La. 935, 162 So. 734, 735, the court, in construing Act No. 55 of 1930, amending and re-enacting the title and the first section of Act 253 of 1918, said:

"The statute does not purport to interfere with the right of an insurance company to limit the so-called coverage, 'in any policy against liability,' to 'liability imposed upon him (the assured) by law,' as this policy provides. An insurance company therefore, may—as the company did in this instance—limit the coverage, or liability of the company, to the obligation to pay only such sums as the insured shall become obligated to pay by reason of the liability imposed upon him by law."

In the case at bar the policy of insurance was not filed in evidence and is not in the record. We therefore do not know what provisions it contains. If the policy was before us we possibly could determine this issue without further discussion. All we have to work on is the admission in the pleadings, and the answers to interrogatories, that there was in effect on this truck a public liability policy for $5,000.

Plaintiff's contention on the question of liability of the casualty company is set forth in her brief. We quote it in full, as follows:

"Suit No. 5905 was brought against the Fidelity & Casualty Company of New York, as the sole defendant. The liability of the defendant was predicated upon allegations that it was the public liability insurer of the United Gas Public Service Company and its employees, against claims arising out of the negligent operation of the motor vehicle here involved.

"The Fidelity & Casualty Company of New York, in its answer to interrogatories on facts and articles, admitted that it was the public liability insurer of the United Gas Public Service Company and any of its employees while driving said truck with the permission of the United Gas Public Service Company.' The policy limit is stated by this defendant to be $5,000.00; interest and costs, of course, being allowable above that amount.

"Now the status of the Fidelity and Casualty Company of New York is such that the Workmen's Compensation Law has no possible connection with its defense. This is true for two reasons—either one of which is sufficient:

"1. As the insurer of the employees of the United Gas Public Service Company, the Workmen's Compensation Law is irrelevant. For by no stretch of the imagination could it be said that these employees would have been personally liable to the plaintiff for compensation. The Compensation Law governs the rights of the employers, employees, principals, and insurers, who have come within its purview by reason of their relationship. But the act had no applicability as to claims between Mr. Dandridge and—for example—J. K. Watkins, individually. So if Mr. Watkins could not plead the compensation law as a defense, the public liability insurer cannot. The same is true of all the other employees; all of whom were additional assureds under the policy.

"2. The Workmen's Compensation Law as a defense is equally unavailable to the Fidelity & Casualty Company of New York as the insurer of the United Gas Public Service Company. For it is well settled that the liability insurer cannot take advantage of defenses purely personal to the assured. It would be absurd to contend that the Fidelity & Casualty Company, under its Public Liability Contract could have been held liable for Workmen's Compensation. Hence the defense is one pertinent only to the assured of the policy, and quite irrelevant to the liability insurer.

"The law on the point seems to have been settled by the courts of Louisiana in: Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191; Rome v. London & Lancashire Indemnity Co., La.App., 169 So. 132; Messina v. Societe Francaise, etc., La. App., 170 So. 801; Revised Civil Code, Article 3060.

"The salient facts of the Edwards case are that Mrs. Edwards sued her husband's insurance carrier for damages for personal injuries alleged to have been caused by her husband's negligence in operating an automobile in which his wife (then his fiancee) was a guest. The court held that the Liability Insurer could not urge 'defenses which are purely personal between the insured and claimant, and in no way growing out of or connected with, the accident or policy.'

"The Edwards case represents the law in this state at the present time. The forerunner of the Edwards case is to be found in the concurring opinion of Chief Justice O'Neill, in Rome v. London & Lancashire Indemnity Company of America, 181 La. 630, 160 So. 121. There a tort action was instituted against the insurance carrier of the New Orleans City Park Improvement Association. The defendant, by exception, raised the point that the assured was engaged in governmental functions only, and not liable in tort. Chief Justice O'Neill said:

"'I consider it a sufficient answer to the plea which is set up in defense of this suit that the suit is brought against the insurer alone.'

"When the Rome case was remanded for trial, the Court of Appeal adopted the view expressed by Chief Justice O'Neill, and added to the reason for this view, the codal provisions in Article 2098 of the Revised Civil Code, the Court emphasizing the second paragraph of the Article, which refers to the co-debtor in solido, which reads as follows:

"'He cannot plead such exceptions as are merely personal to some of the other co-debtors.'

"It is clear from the foregoing that the alternative defenses involving the Workmen's Compensation Law can have no possible relevancy in the suit No. 5905 against the Fidelity and Casualty Company of New York."

Since plaintiff has presented argument only on her second contention, we shall limit our discussion to it. However, we see no merit in the first proposition presented. As we view it, the only question for determination is whether or not the defense successfully urged in its behalf by the assured, United Gas Company, was personal to it. In the case of Edwards v. Royal Indemnity Co., 182 La. 171, 161 So. 191, 194, the court said:

"It seems clear to us that the views expressed in Vitale v. Checker Cab Co., supra [166 La. 527, 117 So., 579, 59 A.L.R. 148], are sound, because the defense of contributory negligence arose out of the accident. But that decision does not go so far as to hold that where the defense is purely a personal one, *i. e., minority, interdiction, coverture, or that it is contrary to the articles of the Civil Code of this state for a minor to sue his father for damages, or a wife to sue her husband in tort,* that the insurance carrier or a joint tort-feasor, who was liable in solido, has the right to interpose or urge such defenses against the claim of the minors or the married woman for damages for personal injuries negligently caused by the father and husband, respectively. * * *

"It is, therefore, our opinion that the Legislature intended to give the insurer the right to plead defenses which it could urge against the insured, *but not defenses which are purely personal between the insured and claimant, and in no way growing out of, or connected with, the accident or policy.*" (Italics ours).

In the case of Ruiz v. Clancy, supra, the court discussed the Edwards case as follows:

"The ruling in the Vitale Case was referred to with approval in the opinion rendered in the case of Mrs. Carmen F. Palmer Edwards v. Royal Indemnity Co. (La.Sup.) [182 La. 171], 161 So. 191. In the latter case, Miss Carmen F. Palmer, before she was married to Edwards, suffered bodily injuries in an automobile accident, caused by the negligence of Edwards, who was driving the automobile. Miss Palmer sued Edwards for damages, and thereafter married him. On an exception to the capacity of the wife to proceed with her suit against her husband for damages for a tort, the suit was dismissed. Mrs. Edwards appealed, and, while the appeal was pending, she sued the insurance company, under the provisions of Act No. 55 of 1930. That suit also was dismissed on an exception of no cause or right of action; and Mrs. Edwards again appealed. The court of appeal affirmed the judgment in both cases. See Palmer v. Edwards (La.App.) 155 So. 483, and, on rehearing (La.App.) 156 So. 781; and Edwards v. Royal Indemnity Co. (La.App.) 155 So. 472. On the application of Mrs. Edwards for a writ of review, this court approved the judgment dismissing the suit against Edwards, and re-

fused to issue the writ, but granted the writ in the case against the Royal Indemnity Company, and reversed the judgment. The purport of the decision was that the abatement of Miss Palmer's right of action against Edwards, by effect of her marrying him, was a matter which did not concern the insurance company, because the abatement of the action against Edwards had nothing to do with the merits of the claim of Miss Palmer; or Mrs. Edwards, against either Edwards or the insurance company. The incapacity of the woman to prosecute the suit against Edwards was only a relative incapacity on her part, or relative immunity on his part, and did not affect the rights of the insurance company any more than it would have affected the rights of the insurance company if Miss Palmer had merely refused to sue Edwards, and had not married him. Insurance is not like suretyship, in that an insurer who pays the loss has no recourse against the insured, as a surety who pays the debt has against the principal debtor. In Act No. 55 of 1930, the insurer and the insured are referred to as being liable in solido if the insured becomes liable for a claim for damages, but, in such case, the insurer is like the principal debtor. That is one of the effects of the act of 1930, in allowing an injured party to sue the insurer alone. *The decision in Edwards v. Royal Indemnity Co., merely recognizes a distinction between a case where there is no cause of action against the insured, and hence no cause of action against the insurer, and a case where there is no right of action against the insured because of a relative incapacity of the injured party to sue the insured, or relative immunity of the insured against being sued by the injured party,* in which case, according to Edwards v. Royal Indemnity Co., the injured party may have a right of action against the insurance company alone, under the act of 1930. *With regard to the merits of a claim against an insured, the statute does not give the claimant a right of action against the insurance company unless the claim against the insured is well founded in law.* That is in accord with the language of the policy contract, and is not contrary to any provision of the statute. The last paragraph of the statute provides that, in a suit brought by an injured person against the insurance company alone, the company may urge any defenses which the company might urge in a suit brought against the company by the insured, to recover a loss which he has been compelled judicially to pay to the injured party. The Court of Appeal for the First Circuit, apparently, misconstrued this provision in the last paragraph of the statute, in Edwards v. Royal Indemnity Co. [La.App.], 155 So. 472, as this court pointed out in reviewing the decision. In the present case, the plaintiffs' petition discloses a cause of action, and they have a right of action against Christopher Lochbaum, who, by the terms of the policy of insurance, is deemed to have been the insured." (Italics ours).

A study of the discussion of the Edwards case by Chief Justice O'Niell, quoted above, makes very apparent to us a wide distinction between the case at bar and the Edwards case. In the case at bar plaintiff's claim against the United Gas Company is not well founded in law, for the reason the law provides that her sole and exclusive right is to claim compensation. There is no relative incapacity of the plaintiff to sue the insured, United Gas Company, and there is no relative immunity of the insured against being sued by plaintiff. The law only defines the kind of suit she may bring against the insured, the same as it defines the kind of action that can be brought under any other given state of facts. It might be difficult to define all defenses which should be classed as personal. It is not difficult to understand what the court means by personal defenses when we take the examples given in the Edwards case, to-wit: minority, interdiction, coverture, or that it is contrary to the Civil Code for a minor to sue a father for damages or a wife to sue her husband in tort.

■■ In Act No. 55 of 1930, the insurer and the insured are referred to as being liable in solido if the insured becomes liable for a claim for damages. But in such case the insurer is like the principal debtor, and if the claim against the insured is not well founded in law, the insurer is not liable. We are convinced the casualty company has the legal right to urge the same defense urged here by the insured, United Gas Company, and the defense is sound, well taken, and is sustained.

■ Plaintiff lastly contends that it was optional with her whether she claimed compensation from United Gas Company or brought suit in tort, and that she chose the latter remedy. This contention, to our minds, is entirely without foundation in law. We might add, the plaintiff is receiv-

ing compensation weekly from deceased's original employer. She could not receive compensation from it and the United Gas Company too. And if she had claimed and received compensation from the United Gas Company it could have recovered the amount paid from deceased's original employer if he was an independent contractor. The compensation act so provides.

We are convinced the judgment of the lower court is incorrect, and it is reversed in all respects and the demands of plaintiff and intervenor are rejected at their costs.