**Louis FONTENOT**

v.

**STANOLIND OIL AND GAS COMPANY,**
**Liberty Mutual Insurance Company,**
**Intervenor.**

**Viola ANDRUS, Widow of Eugene Laviolette, Individually, and on Behalf of Minor Child, Richard Allen Laviolette,**

v.

**STANOLIND OIL AND GAS COMPANY,**
**Liberty Mutual Insurance Company,**
**Intervenor.**

**Civ. A. Nos. 5352, 5353.**

United States District Court
W. D. Louisiana, Opelousas Division.

Sept. 21, 1956.

819

Paul C. Tate, Mamou, La., Emile A. Carmouche, Jr., Crowley, La., for plaintiffs.

Lemle & Kelleher, Adams & Reese, New Orleans, La., for defendant.

Davidson, Meaux, Onebane & Nehrbass, Lafayette, La., for intervenor.

HUNTER, District Judge.

These consolidated cases arise out of a fire which occurred on January 25, 1955, on a lease of Stanolind Oil and Gas Company in the "Pine Prairie Field" in Evangeline Parish, Louisiana. They present two more of the ever increasing tort suits brought by covered and fully compensated employees of a contractor against the principal.

The two complaints and the respective causes of action are almost identical except one involves a death action and the other a personal injury suit. Defendant seeks summary judgment in each case on the theory that no material fact issue is in dispute, and that as a matter of law plaintiffs cannot recover.

The question is whether workmen's compensation was plaintiffs' exclusive remedy under pertinent Louisiana statutes [1]. The substantial question which this Court must now decide is:

" '1. Where any person (in this section referred to as principal) undertakes to execute any work, *which is a part of his*

1. "Section 6 of Act 20 of 1914 as amended, LSA–R.S. 23:1061 to 23:1063, provides:

Does the record present a fact issue for the jury to decide as to whether the work being done by the employees of the contractor at the time of their injury was a part of the defendant's trade, business or occupation within the meaning of Section 6 of the Louisiana Compensation Statute? (Footnote 1, supra.)

Plaintiffs seek to defeat the motion for summary judgment and to avoid the bar to their cause of action by alleging that the work which was being done at the time of the explosion and fire was not a part of the regular trade, business or occupation of the defendant. Nevertheless, the law is well settled that for the purposes of a summary judgment motion the allegations of the complaint are not necessarily to be taken as true and must give way to facts on which there can be no difference of opinion.

The uncontradicted affidavits of six persons have been made a part of defendant's motions.

The affidavit of T. L. Cullom, Field Superintendent for Stanolind, discloses:

That Stanolind is a large integrated oil company which prospects for oil, and produces, refines, and sells petroleum products. In its operations it drills its own wells, both by its own employees and through the medium of independent contractors. It likewise operates its own oil fields.

Installed in the Pine Prairie Field where this accident occurred were four emulsion heater treaters. An emulsion heater treater is a large vessel; its mechanical value is to separate oil from the water by means of heating, the oil being saved and the water being run off through a discharge pipe. The heater treaters at the Pine Prairie Field have been owned by Stanolind for approximately six years and had been in operation there for over four years, during which time they had been serviced periodically by Stanolind employees or by outside contractors.

Stanolind has on its Lafayette payroll 79 employees doing maintenance and service work, but when the servicing work is greater than these men can take care of, outside contractors are called in to furnish labor to perform the maintenance and service. At the time that the

---

*trade, business or occupation or which he had contracted to perform, and contracts with any person* (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or his dependent, any compensation under this act which he would have been liable to pay if that employee had been immediately employed by him; and where compensation is claimed from or proceedings are taken against the principal, then, in the application of this act, reference to the principal shall be substituted for reference to (his) employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.

\* \* \* \* \*

" '3. Nothing in this section shall be construed as preventing an employee or his dependent from recovering compensation under this act from the contractor instead of from the principal.

" '4. A principal contractor, when sued by an employee of a subcontractor or his dependent, shall have the right to call that subcontractor or any intermediate contractor or contractors as a co-defendant, and the principal contractor shall be entitled to indemnity from his subcontractor for compensation payments paid by the principal contractor on account of an accidental injury to the employee of the subcontractor.'

"Section 34 of Act 20 of 1914 as amended, LSA–R.S. 23:1032, provides:

" 'the rights and remedies herein granted to an employee or his dependent on account of a personal injury for which he is entitled to compensation under this act shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, relations, or otherwise, on account of such injury.' " (Emphasis mine.) Isthmian S.S. Co. of Delaware v. Olivieri, D.C., 202 F.2d Footnote 1 at page 493.

employees involved here received their injuries, they were performing work customarily performed by Stanolind employees but they were employed by B. Lewis Contractor, Inc., of Eunice, Louisiana, a contractor who regularly does subcontracting work for Stanolind.

V. G. Primrose, Stanolind's Pumper on the lease, discloses by affidavit that:

The four heater treaters are under his primary supervision. They are serviced at irregular intervals, but maintenance work has been performed on all of them during the period that he has been employed on the lease. On some occasions the maintenance was performed by Stanolind employees, but on other occasions by employees of outside contractors. Mr. Primrose, in the course of a routine inspection of the lease, on the morning of January 25, 1955, noticed that one of the heater treaters was not functioning properly and he called his Gang Pusher, George Wolfe, to advise him of the situation. Five employees of B. Lewis Contractor, Inc., arrived and started cleaning the heater treater.[2]

George Wolfe, the Stanolind Gang Pusher, by affidavit reveals:

That Mr. Primrose called him and advised that some oil was escaping from one of the heater treaters. Since he had no Stanolind employees available to do the necessary repair or maintenance work, he called the office of B. Lewis Contractor, Inc., at Eunice, Louisiana, and requested that they furnish Stanolind with a Pusher and four men to clean and wash the heater treater. During the six years he was working for Stanolind he had seen and supervised cleaning and maintenance work on this type of equipment on numerous occasions, and such work is normally done by Stanolind employees, but where no employees are available, by outsiders.

Luke T. Boone gives us the following information:

"I am employed by Stanolind Oil & Gas Company as a Head Roustabout and was so employed on January 25, 1955. On that day at about 4 p. m. I went to the O & V Ardoin Unit 'B' Lease in the Pine Prairie Oil Field, to check on a valve on a treater, which I had been told was not functioning properly.

"I met Edward M. McDaniel, the pusher of a crew of men employed by B. Lewis, Contractor, Inc., coming from the location. McDaniel told me he was looking for our pumper because the top compartment of the treater which he was cleaning was hot. I went to the treater with McDaniel and noticed vapor coming out of the top compartment. I told McDaniel to have his men put the flanges back on the treater to permit it to cool down or smother any smoldering matter contained in the compartment, and while they were doing so, an explosion and fire occurred which burned Fontenot and Laviolette, two of the employees of B. Lewis Contractor, Inc., engaged in cleaning the treater."

E. M. McDaniel, the Foreman of the crew on which Fontenot and Laviolette were working, says:

"I am employed by Eunice Contracting Company, Inc., as a Pusher. On January 25, 1955, I received orders to proceed with a truck and four men, Eugene Laviolette, Lewis Fontenot, Dovic Marcantel and Glady Thibodeaux, to the Stanolind Oil & Gas O & V Ardoin Unit 'B' Lease at Pine Prairie Oil Field near Easton, La. We started to clean a treater on the leasehold but before we had completed the job we noticed vapor or smoke coming from the top compart-

---

2. Two of whom were Lewis Fontenot (plaintiff in Suit No. 5352) and the late Eugene Laviolette (husband of plaintiff in Suit No. 5353).

ment. I talked with Luke Boone, head roustabout for Stanolind Oil & Gas Company, who was there, and he advised us to cease work and to put the flanges back on the open sections of the heater so that any fire in the heater would be smothered. While this was being done an explosion and fire occurred in which Laviolette and Fontenot were burned."

Joseph C. Moss, the Office Manager of B. Lewis Contractor, Inc., discloses by his affidavit that:

An order was received by his organization for a Pusher and a crew of four men to be sent to the Stanolind lease for the purpose of performing maintenance or service work on some of the equipment. Pursuant to the order, the four men under McDaniel as their foreman were sent to the lease. B. Lewis Contractor, Inc., is owned by the same interest which owns Eunice Contracting Company, Inc., and the two corporations have joint offices. They are engaged in substantially the same type of work. B. Lewis Contractor, Inc., is an approved contractor for Stanolind, so when Stanolind sends an order to B. Lewis Contractor, Inc., for labor, Lewis fills the order and invoices Stanolind on its own billhead. If labor only is involved, however, as was true in the instant case, the employees regularly on the payroll of Eunice Contracting Company are sent to perform the work, and that company is reimbursed by Lewis for the amount of the charges made to Stanolind.

Plaintiffs have offered detailed affidavits by Mr. McDaniel and by another member of the crew, Mr. Glady Thibodeaux, which read in pertinent part as follows:

Mr. E. M. Daniel says:

"I am employed by Eunice Contracting Company, Inc., as a Pusher. On January 25, 1955, I received orders to proceed with a truck and four men, Eugene Laviolette, Louis Fontenot, Dovic Marcantel, and Glady Thibodeaux, to the Stanolind Oil Field near Easton, Louisiana.

"We started to clean a treater on the leasehold.

"We commenced on the first or lower compartment. When the first excelsior was removed, I took a small handful of it and noticed that it was 'charred' and could be powdered very easily. We saw no live coals or smoke in this compartment.

"We left the first or lower compartment open and removed the flange from the second or middle compartment. Here the excelsior was still charry. As we were finishing the removal of the excelsior in this compartment, my attention was called to white vapor or smoke coming from the top of the opening of the second compartment.

"We left the second compartment and removed the flange from the third or top compartment. Considerable smoke came out when we removed the flange and continued to come out. Laviolette removed a few handfuls of excelsior when I noticed that a piece or chunk, in falling, trailed a 'bluish-white' smoke or vapor. When it touched the ground, I picked it up. It was smouldering (had live coals in it) and it burnt my fingers appreciably. I immediately turned to Louis Fontenot standing beside me and said, 'Louis, this is on fire!' I shouted up to Laviolette: 'Gene, get down off that ladder, this could blow up!' I then told all the men to get out of the fence (enclosure) and away from the fence. At this time, I intended to notify Stanolind Oil Company of the condition of the treater and return the next day to finish the job. I definitely did not intend to do any work on the treater again.

"I left the site of the treater to find a company (Stanolind) man to report to.

"While on my way out and a very short distance from the treater, I met Mr. Luke Boone. I stopped him and told him I thought the treater was on fire and I pointed to the smoke coming out of the third compartment—it was considerable by now. Mr. Boone immediately went to the treater location. Since I was headed in the other direction, I had to find a place to turn my truck around and when I returned to the treater, Boone had been there a short while. When I arrived, I said, 'Boone, the only thing to do is to fill it up with water!' to which Mr. Boone replied, 'We'll put the flanges back.'

"Mr. Boone then took charge, went up to my men, and they returned to the treater. Laviolette went up the ladder. I was afraid to go near the treater myself, but, since my men were there, I went to the foot of the treater where I suggested to Thibodeaux and Fontenot that we could hurry things up if we put the bolts through the flanges before passing them up to Laviolette for replacing them on the treater. I took some bolts and put them through the holes, as did the other men. At this time Mr. Boone had left the enclosure and was on the outside of the fence. I walked over to the fence and we started to discuss a way to get rid of a considerable amount of oil which had run on the ground. Then the fire and explosion occurred.

"I do not want to blame anyone. I am sure no one meant for anybody to get hurt. I wish we had just left instead of going back in. I definitely did not give any order to my men to get back in and put back the flanges. The last order I gave was to leave the job and get out of the enclosure."

Mr. Glady Thibodeaux says:

"On January 25, 1955, I was employed by B. Lewis Contracting Company and/or Eunice Contracting Company, Inc., doing the same work as Louis Fontenot and Eugene Laviolette. On that date, Eugene Laviolette, Louis Fontenot, Dovic Marcantel, and myself went, with our foreman, Mr. E. M. McDaniel, to the Pine Prairie Oil Field near Easton.

"We went to a heater treater and removed a flange and took out some excelsior. Laviolette was taking out the excelsior and the rest of us were putting it in a wheelbarrow and carting it away.

"We cleaned the first compartment, then cleaned the second compartment. As we cleaned the second compartment, we could see smoke coming from above and escaping at the top of the opening in the second compartment.

"Laviolette then removed the flange on the third compartment and, when this was removed, a considerable amount of smoke escaped.

"Laviolette started taking out the excelsior with his hands. After a few handfuls, I noticed some live coals coming down with the excelsior. When the coals hit the oil on the ground it would cause a momentary puff of smoke. Our pusher, Mr. McDaniel, caught some of the burning excelsior and told Laviolette to come down the ladder and told us all to get out of the yard because the heater was on fire.

"We got out of the yard and Mr. McDaniel took off towards the road for a company man. Before Mr. McDaniel returned, Mr. Boone of Stanolind Oil Company arrived. He immediately told us not to remove any more excelsior but to load the excelsior we had taken out in a wheelbarrow and throw it near a gully. He then stated to us all, in French, saying, 'We will leave this until tomorrow morning.' We then stood around a few seconds. Mr. Boone then said, in French again, 'Let's replace the placques (flanges) before we leave.'

"Mr. Boone asked Louis to go up the ladder and replace the flanges. Louis (Fontenot) refused. Mr. Boone then told me to go up and I refused. Then Mr. Boone told Laviolette to go up and he started towards the heater. I told Laviolette not to go up; that the heater would take on fire. Mr. Boone told Laviolette that there was no danger and to go ahead.

"At this time, there was considerable smoke coming out of the two upper compartments.

"As Laviolette went to the heater and up the ladder, we went with him to hand him the flanges and Mr. Boone walked out of the enclosure and stood about twenty or thirty feet outside the fence looking on.

"When the fire started, there was so much smoke that I couldn't see anything. I could hear Laviolette screaming and I guess the other man screaming was Louis. I could also hear Mr. Boone shouting, 'Get the men out of there.' "

█ The Louisiana Courts have several times interpreted the pertinent sections of the Workmen's Compensation Law and pursuant to Erie R. R. v. Tompkins, we are bound by the interpretation placed upon the law by them.

█ The Court has reached the conclusion that the trade, business and/or occupation of Stanolind was and is the production, saving and marketing of oil, gas and other petroleum products, and that the operation of emulsion heater treaters to separate the oil from the water, including the cleaning and servicing of same, is legally a part of Stanolind's trade, business and/or occupation. If a jury were to hold otherwise, I would, under the law as construed by the courts, feel it my duty to set that verdict aside. This would be required, I believe, by the reasoning in Thibodaux v. Sun Oil Company, 218 La. 453, 49 So.2d 852; Spanja v. Thibodaux Boiler Works, La.App. 2 So.2d 668; Turner v. Oliphant Oil Corporation, La.App., 200 So. 513; Wynn v. Fidelity and Casualty Company, La.App., 85 So.2d 315.

In the Federal Court a similar ruling was handed down by the Court of Appeals for the Fifth Circuit in Isthmian S. S. Co. v. Olivieri, 5 Cir., 202 F.2d 492, 494, in that case the plaintiff was an employee of a watchman service which was under contract to the defendant to watch its wharf. While performing his duties as a watchman a crate fell on the plaintiff, causing injuries for which he sued defendant in tort. The case went to the jury on a specific interrogatory:

"'Were the duties performed by the plaintiff normally part of the trade, business or occupation of the Isthmian Steamship Company?'"

The jury answered "no", and the lower court held that there was substantial evidence in the record to support the jury's finding. However, the Court of Appeals for the Fifth Circuit disagreed and reversed concluding that the district court erred in denying defendant's motion for a directed verdict. The language used by Judge Rives in the Isthmian case is extremely applicable. Speaking for the Fifth Circuit, he had this to say:

"On the law, the Louisiana cases are of course controlling. Those cases have settled that the compensation statute is to be liberally construed so as to include all services that can reasonably be said to be within the statute not only when the injured person seeks its protection, but when he attempts to have himself excluded from the coverage of the act. The decisive factors are the nature of the employee's work and of the principal's trade, business, or occupation. Unless the work is of such a special or separate character as would not ordinarily or appropriately be performed by the principal employer's own employees in the prosecution of its business or as an essential part thereof, it is a part of the principal's trade, business or occupation. Dandridge v.

Fidelity & Casualty Co., La.App., 192 So. 887, 891; Thibodaux v. Sun Oil Company, La.App., 40 So.2d 761, 764, 765, affirmed 218 La. 453, 49 So.2d 852; Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137, 144."

We are fully cognizant of and have carefully studied Tucker v. Texas Co., 5 Cir., 203 F.2d 918, decided on April 27, 1953. There, plaintiff was an employee of the Abere Company, Inc., which had its principal place of business in Houston, Texas. He was sent to Louisiana to work for his employer in carrying out its contract for the insulation of certain equipment owned and operated by defendant. Under that contract, defendant was to furnish, erect and dismantle scaffolding required for the insulation work. While engaged in insulating the legs of a spherical tank located on defendant's cycling plant, the scaffolding board upon which plaintiff was standing broke and he sustained serious injury. The Federal District judge in Texas where the suit was brought granted the Texas Company's motion for summary judgment. The Court of Appeals reversed and remanded, because the affidavits and counter-affidavits presented a disputed issue of fact. We do not have the affidavits and counter-affidavits before us, but apparently the Court of Appeals thought that such evidence presented an issue of fact as to whether the insulation of the equipment was a part of the trade, business or occupation of The Texas Company. The Circuit Court was careful to distinguish the Isthmian case, supra, where it was held as a matter of law that a watchman employed by an independent contractor was performing work that was part of the trade, business or occupation of the steamship company.

It is appropriate to note that subsequent to the Tucker decision, the Louisiana Courts have held in no uncertain terms that even the repairs of a building housing a hazardous business is part of the trade, business or occupation of that employer. Speed v. Page, 222 La. 529, 62 So.2d 824; Wynn v. Fidelity & Casualty Company of New York, La.App., 85 So. 2d 315, decided March 15, 1956.

Plaintiffs suggest that the affidavits of McDaniel and Thibodeaux leave unresolved the question as to whether Fontenot and Laviolette, just before the accident, had abandoned their work for the contractor. There is no doubt in my mind that the affidavits clearly disclose that they were in the course of their employment for the contractor when the accident occurred. Kern v. Southport Mill, 174 La. 432, 141 So. 19; Rogers v. Mengel Co., 189 La. 723, 180 So. 499. In addition, if I am mistaken in this view, and if Stanolind did take over control of the work, it would necessarily follow that then the employees became Stanolind's employees and workmen's compensation would still be the exclusive remedy.

We reached the inescapable conclusion that Mr. Fontenot and the late Mr. Laviolette were employees of an independent contractor performing work for Stanolind for which they would be entitled to recover workmen's compensation under the provisions of LSA–R.S. 23:1061 from Stanolind. In view of the fact that LSA–R.S. 23:1032 provides:

"The rights and remedies herein granted to an employee or his dependent on account of a personal injury for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee * * *",

plaintiffs do not have a remedy in tort against Stanolind.

The motions for summary judgment should be sustained. They are.

I have always felt it unnecessary in the case of motions for summary judgment to prepare findings of fact and conclusions of law; but as the contrary seems to have been the practice, findings of fact, conclusions of law and form of judgment should be prepared by counsel for Stanolind and submitted to the Court on notice.