CHRIS T. BARNETTE, Judge pro tem.
From a judgment in favor of plaintiff, Davis James, against the defendants Lykes Brothers Steamship Co., Inc., Hartford Ac *446 cident and Indemnity Co., and Lumber-mens Mutual Casualty Company, in solido, in the sum of $50,000.00 and in favor of the intervenor, Hayes Drayage and Storage Co., Inc., against the same defendants in the sum of $11,700.55, defendants have appealed suspensively.
The statement of the case and the facts are so accurately set out in great detail by the able trial judge in his “Reasons for Judgment” that we quote the following excerpts therefrom which we adopt in full as our statement of the case:
“This is a case involving an accident which occurred on October 21, 1961, on the Celeste Street wharf, in New Orleans. The plaintiff, Davis James, was employed as a truck driver for Hayes Drayage & Storage Company, Inc. and about 1:30 P.M. on the day in question, which was a Saturday, he was severely injured when several bundles of mahogany lumber, each bundle weighing in the neighborhood of 900 pounds, fell on him. He alleges that the bundles were caused to fall by the actions of one James Bell, a lift truck operator, employed by Lykes Bros. S. S. Co., in his negligent attempts to unload them from the Hayes truck. Pie pled res ipsa loquitur, and in the alternative, active negligence upon the part of Bell and lacle of contributory negligence on his own part. The employer, Hayes Drayage & Storage Co., Inc. intervened seeking to recover by way of subrogation, both legal and conventional, the amounts expended by it for the account of plaintiff under the Workmens Compensation Act and for additional medical expenses.
“Plaintiff filed his original suit on October 8, 1962, naming Lykes Bros. S. S. Co., Inc., as employer of James Bell, and its insurer, Hartford Accident & Indemnity Company, as defendants. On Monday, October 22, 1963, plaintiff amended his suit to add a defendant, Lumbermens Mutual Insurance Company, as insurer of James Bell, under the 'loading and unloading1 coverage afforded with respect to the truck which was being unloaded at the time of the accident. Subsequently on May 20, 1963, a second amended petition was filed, the effect of which was to correct and change the name of the last named defendant to Lumbermens Mutual Casualty Company. The original intervention by Hayes Drayage & Storage Co., Inc. was filed on October 22, 1962, and was later amended to include the additionally named defendant, Lumbermens Mutual Casualty Company.
“The merits of this case require the Court to resolve a conflict in factual evidence. Having done so, this Court finds that, on the day in question, Hayes Drayage had contracted with Lykes Brothers to move a large amount of bundled mahogany lumber from the Stuyvesant Street docks to the Celeste Street wharf in New Orleans. The bundles were square in shape, and apparently averaged about two feet square, and were from 10 to 20 feet in length. They were bound into bundles by means of a steel binding band on each end of the bundle. They were loaded at the Stuyvesant Street docks by the Hayes people, on the Hayes trucks, and were unloaded at the Celeste Street wharf by Lykes employees.
“On the day in question, the plaintiff, James, had previously trucked two loads and been unloaded uneventfully. On his third load the accident occurred. Four persons testified, as eye witnesses to its occurrence, James the plaintiff, Bell the lift truck driver, another truck driver named Willie Hall, and Joseph Gagliano, a watchman over the Lykes Brothers cargo located between sections 1-25 on the said wharf, employed by the Lehon *447 Protective Police Service, under contract to Lykes.
“The James truck was a large trailer and tractor, with an overall length of approximately fifty feet, and with the flat trailer portion thereof about thirty five feet long. The bundles of wood were loaded in two sets, one group being on the front portion of the trailer, and the other group in the rear, end to end. They were loaded on sticks of lumber placed from side to side on the trailer, to furnish them a firm foundation on the truck bed, and to provide room for the insertion of the prongs of the lift truck for loading and unloading. The bundles were then bound firmly on the truck by means of large chains, which were tied on either side of the truck bed by passing the ends through a steel rail running along the side of the truck, and, after being tied, each end is further fastened by hooking the end of the chain back upon the chain itself, using a hook which is located on each end of the chain. In this manner each chain is made hand tight, and then is further tightened by the use of a chain binder, which is a device about two feet long, with a hook on either end, and provided with a lever, which, when depressed, caused the hooks to come together some four to six inches. In this manner, the hooks of the binder were inserted in links of the chain, and when the lever was depressed they came together, causing the chain holding the load to become very tight around the load.
“James testified that there were four such chains on his load, and the other witnesses didn’t know exactly how many held the load.
“All witnesses agreed that the Celeste Street wharf was a very long, enclosed, steel building, covered with corrogated steel, about two hundred feet wide, and equipped with a series of sliding doors, on steel rollers, most of which doors were closed on the day in question.
“It is also agreed that when James arrived, he parked his truck in the middle of the work area in the center of the wharf, facing upstream, with the left side of the truck on the river side of the wharf, and the right side on the Tchoupitoulas Street side of the wharf, and that the said truck was parked in front of what is known as Section 13 of said wharf.
“All witnesses testified that, before it actually fell, the load on James’ truck was solid and stable, even while he worked on it to prepare it for unloading, and even after he had succeeded in loosening all the chains which braced it
“At this point there arose some conflicts in the testimony of the witnesses. The Court had the opportunity to hear these witnesses examined, and cross-examined, and to question them, and also to observe their demeanor while testifying, and finds that the events leading up to the accident were as follows :
“James drove his truck to the position previously described and started to prepare it for unloading. He succeeded in loosening the first three chains without difficulty, but on the fourth and last chain, the one nearest the front of the truck, the chain binder was jammed and he could not release it; that he worked on this chain binder about five minutes when the next Hayes truck, driven by one Willie Hall, drove up and parked some thirty feet in the rear of James’ truck, and that when Hall saw James was having trouble with the chain binder, he went to help him, as is customary; that James and Hall got a small lift truck, which was standing idly by and drove it next to the left side of James’ truck *448 where the jammed binder was, and putting a pallet board on top of it, stood on the pallet board where they were then high enough to work on the jammed binder; that they succeeded in releasing the binder, at which point the load was still sturdy, and James untied the chain on the left, or river, side of the truck while Plall backed the small lift truck some fifteen or twenty feet away to the point it had been located before they used it; that James went around the front of his truck and began to untie the chain on the right, or Tchoupitoulas Street, side of his truck, when Bell, without any signal from anyone, began to unload the truck; that Bell inserted the prongs of his lift truck as far as they could reach under the load, and that when he lifted the prongs to raise the load from the truck bed, the points of the prongs of the lift truck, projecting under the bundles on the right side of the truck, disturbed these bundles, caused the bottom bundles to move, which in turn caused the top bundles to topple over, and fall on James, who was busy untying his chain on the right side of the truck.
“The Court finds that any other explanation of the cause of the accident is not supported by the facts. * * * ”
The next several pages of the “Reasons for Judgment” contain a review of the testimony of the witnesses in detail which we find no reason to repeat. We fully agree with the trial court’s factual findings as to the cause of the accident.
Two special defenses were pleaded.
The statutory employee doctrine was pleaded on behalf of Lykes and its insurer Hartford as follows:
“ * * * that the operations in which plaintiff was engaged at the time of the accident are a regular part of Lykes’ business; that plaintiff was an employee of Hayes who was performing part of Lykes’ regular business under contract, that the Louisiana Workmen’s Compensation Law is applicable to the facts of this case and that under said law, particularly RS 23:1061, Lykes was the ‘statutory employer’ of plaintiff, and plaintiff’s sole remedy is in workmen’s compensation and that plaintiff has already compromised, settled and discharged all of his rights under said compensation law by proceedings in this court with Hayes Drayage and Storage Co., Inc., and he has no remedy in tort.”
Lumbermens Mutual Casualty Company pleaded prescription of one year based on the following facts: The accident occurred October 21, 1961, a Saturday. October 21, 1962, therefore, fell on a Sunday. On October 22, 1962, the plaintiff sued Lumber-mens Mutual Insurance Company. On 20, 1963, plaintiff, having discovered his error in the name, amended his petition and named Lumbermens Mutual Casualty Company. This defendant was the automobile liability insurer of Hayes Drayage and Storage Co., Inc., and under the “loading and unloading” clause of the policy was sued as insurer of Bell as above stated. Bell was not sued individually.
It is conceded by defendants-appellants that if Lykes’ special defense of “statutory employer” is not sustained, then timely suit in tort against it and its insurer would interrupt prescription against all defendants. We must first, therefore, consider the special defense of “statutory employer”.
 The plea of “statutory employer” under the provisions of LSA-R.S. 23:1061, whether it be the basis of suit or as a defense, as in the instant case, is an affirmative plea and the burden of proof is upon the party asserting it. This burden must be discharged by a preponderance of the evidence. Hartford Accident & Indemnity Company v. Loomis, La.App., 166 So.2d 532 (La.App. 4th Cir. 1964); Young v. *449 First National Life Insurance Company, 159 So.2d 395 (La.App.2d Cir. 1963); Winru Chemical & Sales Co. v. Collier, 73 So.2d 9 (La.App.2d Cir. 1954).
Plaintiif has contended in his brief that “no evidence whatsoever has been introduced to describe and detail the trade, business or occupation of the Steamship Company, so, we can only assume that the hauling of lumber was not a part of the trade, business or occupation of said principal.” Thus, he contends, the defendant has failed to discharge the burden of proof of its special defense.
We have carefully searched the record and testimony before us and find an almost total absence of evidence relating to the “work”, “trade”, “business”, or “occupation” of Lykes Bros. Steamship Co., Inc., and the procedures customarily employed therein as required to invoke the provisions of LSA-R.S. 23:1061.
William P. Barstow, clerk in the employ of Hayes, who was supervising the loading operations on the day of the accident, testified :
“Q Did you have something to do with the loading of the Hayes’ trucks that morning?
“A Supervised the loading of them.
“Q What lumber, what cargo was being loaded?
“A Mahogany lumber.
“Q Mahogany lumber ?
“A Right.
“Q And where was it being taken?
“A Taken to Celeste Street, Lykes Wharf.
“Q And for whose account was that cargo being moved?
“A For the account of Lykes Bros.
“Q Why did you happen to be working on a Saturday morning?
“A They wanted it moved from that wharf to Celeste Street that day so that they could clear Stuy Docks.
“Q Lykes did?
“A Lykes did, yes, sir.
******
“Q Who was to do the unloading of that cargo?
“A Lykes Bros.
‡ j}c ‡ ‡ ‡
“Q What experience have you had in supervising the loading of lumber on trucks such as this particularly on the waterfront of New Or- . leans ?
“A Well long as I worked for Hayes and handled all those mahogany shipments.
“Q And how long-is that, sir?
“A Since 1948, about 15 years.
******
“Q This lumber you weren’t hauling this to consumer? This was just a movement for Lykes from one Dock to another?
“A For the account of Lykes, yes.
“Q And the Celeste Street Wharf is also a Lykes wharf?
“A Yes.”
George W. Nussbaum, employee of Lykes Bros., testified:
“Q Do you know where the lumber was coming from?
“A From Stuy Docks.
“Q And whose cargo was it?
“A As far as I know it was transship cargo for Lykes Bros.
“Q What do you mean when you say transship cargo?
*450 “A Well it’s cargo that comes in on one vessel and it’s transshipped to another port, and we put it on another vessel of Lykes Bros.
“Q And do you know who was doing the actual carrying of the lumber, what company?
“A The draymen?
“Q Yes.
“A Hayes Drayage.
“Q Was this lumber still under Lykes bill-of-lading while it was being moved from one wharf to another ?
“A As far as I know, yes, sir.
“Q In other words, this procedure is being done for Lykes ?
“A Right.”
The plaintiff, Davis James, testified:
“Q And you carried other types of cargo and things to the Lykes’ wharves before, hadn’t you?
“A Yes, sir.
“Q And Lykes usually unloaded it?
“A Yes, sir.
“Q That was part of their job ?
“A Yes, sir.”
From the foregoing testimony it may be inferred that Hayes had done draying of Mahogany lumber for Lykes about IS years, but the frequency of such draying is not disclosed. Whether or not Hayes does draying for Lykes exclusively is not known. The contractual relationship between them is not disclosed. To what extent drayage is essential to its business is not known.
From the foregoing testimony it is evident that this particular shipment of lumber was in Lykes’ control under bill of lading and at the time in transit from one point to another. It may be assumed also from the statement of Mr. Nussbaum that it had been brought in on one Lykes ship and was being transported to another dock for reloading on another Lykes ship. Furthermore, we might assume from the names of the companies that one is engaged in a shipping business and the other drayage.
While shipping and draying are both in the broad area of transportation of goods and commodities, so also are railroads and air express. They each employ methods not common or customarily within the usual business of the others. We can see where drayage may more likely be incidental to the others than they are to dray-age, but this does not necessarily mean that drayage is essential to or within the usual “business” of steamship companies in general or this defendant in particular as intended by LSA-R.S. 23:1061. The defendant has offered no testimony whatever on this subject.
In the absence of more direct testimony, the foregoing assumptions and inferences are not sufficient, in our opinion, to discharge the burden of proof that the work contracted to be performed was within the trade, business, and occupation of defendant Lykes. As far as the evidence before us is concerned we might just as reasonably assume that the drayage of the lumber contracted for w“as a special work not generally done directly by others engaged in the same line of business as the principal. We do not need to assume the latter, since the plaintiff is under no requirement to prove this, but defendant, on the other hand, is required to prove its special defense by a preponderance of evidence. We cannot supply its want of proof with mere assumption.
Both plaintiff and defendant have cited and rely upon the following cases: Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951); Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950); Seabury v. Arkansas Natural Gas Corporation, 171 *451 La. 199, 130 So. 1 (1930); Gant v. Jackson Brewing Company, 112 So.2d 767 (La.App. Orleans 1959); Dandridge v. Fidelity & Casualty Co., 192 So. 887 (La.App.2d Cir. 1939).
We have read and considered these cases and other authorities including Isthmian S. S. Co. of Delaware v. Olivieri, 202 F.2d 492 (5th Cir. 1953); Horrell v. Gulf & Valley Cotton Oil Co., 15 La.App. 603, 131 So. 709 (Orleans 1930); Malone, Louisiana Workmen’s Compensation Law and Practice § 125, and many of the cases there cited, and find no conflict in the law.
In all of the above cases the principal of law is clearly stated and each one was decided on the basis of the factual evidence before the court. In none of them do we find a decision holding a workman to be a “statutory employee” in the absence of testimony in some detail showing the business, trade, or occupation of the principal and that the injured party was engaged in the performance of a duty clearly embraced therein.
We hold that the defendant Lykes Bros. Steamship Co., Inc., and its insurer have failed to carry the burden of proof, and therefore the special defense of “statutory employer” must be rejected. Having done so it is then unnecessary to consider the second special plea, namely, prescription. Timely suit against Lykes Bros. Steamship Co., Inc., interrupted prescription as to Lumbermens Mutual Casualty Company, a codefendant.
As indicated above, we are in complete agreement with the findings of fact of the trial court and hold that the accident and resulting injuries to plaintiff were the direct result of the negligent operation of the fork-lift truck by James Bell, employee of the defendant Lykes Bros. Steamship Co., Inc., and that Davis James was not con-tributorily negligent. The testimony of all the witnesses to the accident was reviewed in detail by the trial judge in his “Reasons for Judgment”. His conclusions are manifestly correct.
Lumbermens Mutual Casualty Company, liability insurer of the Hayes Dray-age and Storage Co., Inc. truck, becomes the insurer of James Bell under the “loading and unloading” provisions of the policy. This is admitted in its answer. It is therefore liable in solido with Lykes and its insurer, Hartford Accident and Indemnity Co.
This brings us to the question of quantum.
There is no question that the plaintiff sustained very severe crushing injuries. The extent of his injuries does not seem to be an issue in the case. However, defendants argue that the quantum awarded by the trial court is grossly excessive and question the extent of plaintiff’s permanent disability. In discussing quantum, the trial judge said:
“The plaintiff, Davis James, in his accident of October, 1961, suffered comminuted fractures of both the ulna and radius of his right arm, four severe fractures in his spinal column, a comminuted fracture of the left femur, both intertrochanteric and sub-trochanteric, fractures of the second and fourth metatarsals of his right foot, in addition to serious kidney complication brought on as a result of his crushing injury, necessitating consultation with Dr. J. L. Fishman, Urologist. Following his accident, plaintiff was hospitalized at both Charity Hospital and Flint Goodridge Hospital for several months, where he underwent two operations consisting of open reduction of his right arm, one which involved surgery on his hip to secure bone for a bone graft, the insertion of an in-tramedullary pin in his arm, as well as traction pins in his arm and leg, surgery for the removal of the in-tramedullary pin, long months of casts *452 on his arm and foot, and several months of a body cast extending from his foot to his chest line, involving medical expenditures in the amount of $4,370.55. Dr. Richard M. Levy, Orthopedist, the attending physician, and the only medical expert who testified in the trial of this matter, testified that Davis James had sustained a 25% permanent disability of the use of his right upper extremity, a 5% permanent disability in his back and left leg, and further that because of his disabled condition, he would in the future be unable to drive a large truck, to perform any work of a heavy, laborious character and would be able to perform only such work entailing light duties.
“The uncontroverted evidence of the plaintiff, and the expert testimony of Dr. Richard M. Levy, proves plaintiff is unquestionably unable to perform work of a heavy and laborious nature.
“When injured in October, 1961, the plaintiff was a strong, healthy man of 37 years, performing work of a heavy laborious nature. The evidence produced at the trial, by stipulation of counsel, revealed that in the year 1959 James earned $3,553.87, that in the year 1960 he earned $3,834.37, and during the first lOji/á months of 1961, when the accident occurred, James earned approximately $4,300.00 per year. Broken down in monthly wages, James earned approximately $296.00 per month in 1959, $318.00 per month in 1960, and $362.00 per month in 1961, proving that James, a steady worker, was enjoying a steady increase in wages.
“It is safe to say that had he not suffered this injury, James could have been able to work at least another 18 years, until he was 55 years, but that uneducated, having only a fifth grade education, and 'patched up’, as he is, he is unable to compete with ablebodied workmen for work.
“Accordingly, the Court finds that the plaintiff, Davis James, suffered a serious, disabling accident while in the employ of Hayes Drayage & Storage Co., Inc. on October 21, 1961; that he was not negligent nor did he contribute to the occurrence of said accident in any way; that said accident was caused solely and entirely by the gross negligence of James Bell, the employee of Lykes Bros. S. S. Co. and the operator of Lykes’ equipment at the time of the accident, and so rule that he is entitled to judgment, subject to intervenor’s right to judgment for its proven expenses and benefits paid, by preference and priority.”
We must decide whether or not the award of $61,700.55 granted by the trial court is an abuse of the “much discretion” that is given to it by LSA-C.C. art. 1934(3). This decision is to be made in the light of the already oft-quoted rule of Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964), and its forerunner, Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), to the effect that the appellate courts should review all the facts and circumstances on which the trial court based the amount awarded to determine whether there has been an abuse of the “much discretion” vested in the trial court. The quantum awarded in so-called similar cases will be considered only in an attempt to determine whether there has been an abuse of discretion or if the present award is “all out of proportion” with awards for similar injuries.
Applying the above-stated standards to the present case, we have decided that the trial court’s award is excessive and should be reduced to $50,000.00. We have been unable to find a case in which the injuries sustained were identical with those suffered by the plaintiff herein. Therefore, we have been faced with the difficult task of compar *453 ing the instant case with prior awards (the only available standard of comparison) and making allowances for the more or less seriousness of the injury in the considered case.
In McCorquodale v. Watson, 170 So.2d 545 (La.App. 3rd Cir. 1965) a 58-year-old man, who suffered injuries to his neck (10-15 percent disability) ; a tissue injury to his left hand (5-10 percent disability) ; loss of two front teeth; mild nose deformity resulting from fracture; low back sprain with residual nervousness; shoulder, chest, head bump, and leg bruises, had a trial court judgment of $32,417.00 reduced to $17,500.00.
In D’Antoni v. Sara Mayo Hospital, 144 So.2d 643 (La.App. 4th Cir. 1962), plaintiff, a 62-year-old female hospital patient, suffered a fracture dislocation of the left ulna, an impacted fracture of the left radius, and an intertrochanteric fracture of the left femur. She could not walk for approximately a year and her left arm became mis-shapened and lost all usefulness. She had been in traction and had pins inserted into the bones of her knee. She received a judgment of $25,000.00 which included medical expenses of $1,304.35.
In Christ v. State, Department of Highways, 161 So.2d 322 (La.App. 3rd Cir. 1964), plaintiff was awarded $20,000.00 for general damage for physical pain and suffering. He had “suffered multiple severe fractures and dislocation of the bone in the left foot, as well as a severe crushing injury to the muscles, soft tissue, blood vessels and tendons of this foot” with a “permanent 30% functional disability of the ankle and foot”.
In Howard v. Early Chevrolet-Pontiac-Cadillac, Inc., 150 So.2d 309 (La.App. 2d Cir. 1963), plaintiff was awarded $25,000.00 for disability, pain, suffering and discomfort and for future medical expenses. He had sustained crushing type fractures of both heels requiring several operations and resulting in 30 percent permanent disability of the left foot and 25 percent permanent disability of the right foot.
In Reiley v. Atlas Construction Company, 146 So.2d 219 (La.App. 2d Cir. 1962), plaintiff, a 73-year-old woman, had an award of $35,000.00 reduced to $25,000.00. Her injuries were principally comminuted fractures of the distal ends of the femurs in both legs. There was no loss of earnings.
In Foreman v. American Automobile Insurance Co., 137 So.2d 728 (La.App. 3rd Cir. 1962), plaintiff was awarded $22,500.00 for multiple compound, comminuted frac- ( tures of both legs. He was hospitalized for several weeks.
In Waagen v. Indiana Lumbermens Mutual Insurance Co., 136 So.2d 831 (La.App. 4th Cir. 1962), plaintiff was hospitalized for 59 days. He had sustained “a closed comminuted fracture of the right tibia and a closed fracture of the right fibula; three Steinman pins were inserted in his leg” and “pins were also inserted in the more distal part of the tibia”. There was a 30 percent disability of the right leg.
In Younger v. Bonin, 149 So.2d 452 (La.App. 3rd Cir. 1963), the lower court award of $10,000.00 was raised to $15,000.00. The plaintiff, a 9-year-old girl, sustained a fractured rib; collapse of the left lung; fracture of the left scapula; compound com-minuted fractures of the left humerus; com-minuted fracture of the left femur; fracture of the transverse process of the first, second and third lumbar vertebrae; a mild cerebral concussion and cuts on her upper lip and chin.
In Dickson v. Peters, 87 So.2d 187 (La.App. 2d Cir. 1956), plaintiff was a 27-year-old laborer earning approximately $55.00 per week prior to his accident. His arm was broken in three places requiring 14 months’ treatment, and he was 25 percent disabled from normal labor and was awarded $20,000.00.
In McCorquodale v. Watson, supra, the Third Circuit, unable to find a case with *454 similar cumulated injuries to their instant case, looked to other cases involving each “separate” injury sustained by their plaintiff, i. e., a hand injury, loss of two teeth, nose disfigurement, etc., and then added the awards given in those cases and allowed for an overlapping of the general pain and discomfort. We find it impracticable to apply that formula in the instant case for it would approach a figure, in our opinion, out of all reason.
Intervenor, plaintiff’s employer, paid compensation in the total sum of $7,-330.00 and hospital and medical bills for plaintiff’s benefit in the amount of $4,370.55. Intervenor has a legal right of subrogation (LSA-R.S. 23:1101) and further by contract executed in its favor by plaintiff, and is entitled to be paid this amount ($11,-700.55) by priority out of the award of $50,-000.00. After payment of $11,700.55 to the intervenor there will be a balance payable to plaintiff in the amount of $38,299.45. The plaintiff having already received through compensation payments $7,330.00, the total award for his injuries over and above hospital and medical bills is $45,629.-45. We believe this to be reasonable.
For these reasons, the judgment is amended and recast so as to grant judgment in favor of Davis James, plaintiff-appelleej and against defendants-appellants Dykes Bros. Steamship Co., Inc., Hartford Accident and Indemnity Co., and Lumber-mens Mutual Casualty Company, in solido, in the full sum of $50,000.00 with legal interest from date of judicial demand, and further that there be judgment in favor of Hayes Drayage and Storage Co., Inc., in-tervenor, against defendants-appellants Lykes Bros. Steamship Co., Inc., Hartford Accident and Indemnity Co., and Lumber-mens Mutual Casualty Company, and plaintiff, Davis James, in solido, in the full sum of $11,700.55 with legal interest from date of judicial demand, to be paid by priority out of the $50,000.00 total award to plaintiff.
As amended and recast the judgment of the trial court is affirmed at defendants-appellants’ cost.
Amended and affirmed.