265 So.2d 787 (1972)
Frank J. DUPLECHIN, Plaintiff-Appellee,
v.
PITTSBURGH PLATE GLASS COMPANY et al., Defendant-Appellant.
No. 3861.
Court of Appeal of Louisiana, Third Circuit.
July 18, 1972.
Rehearing Denied September 13, 1972.
*789 Holt & Woodley by Edmund E. Woodley, Lake Charles, for defendant-appellant.
Maurice L. Tynes, Camp, Carmouche, Palmer, Carwile & Barsh by Harry E. Barsh, Jr., Lake Charles, for plaintiff-appellee.
Plauché, Smith & Hebert by James R. Nieset, Stockwell, St. Dizier, Sievert & Viccellio by Fred H. Sievert, Jr., McHale & Bufkin, by Louis D. Bufkin, Lake Charles, for defendants-appellees.
Before FRUGÉ, SAVOY and DOMENGEAUX, JJ.
SAVOY, Judge.
Plaintiff, Frank J. Duplechin, filed this suit in tort, seeking damages for personal injuries arising from an explosion which occurred October 10, 1968, on the premises of Pittsburgh Plate Glass Company (hereinafter called PPG) in Calcasieu Parish. Suit was brought against PPG; Travelers Insurance Company, as liability insurer of PPG; Robert E. Baker, William L. Smith, Jr., Theodore C. Sachs, Ben F. Spalding, Clifford R. Stacy, Alvin T. Raetzsch, Dewey L. Duncan, and Everett L. Cook, all of whom were employees of PPG; Sargent & Lundy; Donald Q. Schultz, an employee of M. W. Kellogg Company; Layne-Louisiana Company, Inc.; Gulf States Utilities Company; and Associated Indemnity Company.
Plaintiff's suit against Layne-Louisiana Company, Inc., Associated Indemnity Company, and Gulf States Utilities Company was dismissed before the trial on motions of summary judgment. This dismissal was not appealed.
Travelers Insurance Company, as the workmen's compensation insurer of M. W. Kellogg Company (plaintiff's employer), intervened to recover benefits and medical expenses paid to plaintiff.
Following a jury trial, a verdict was rendered in favor of plaintiff and against PPG in the sum of $172,000.00. The verdict further provided that Travelers, as intervenor, was entitled to recover previously paid workmen's compensation benefits and medical expenses totaling $23,840.21. All remaining defendants were absolved of any liability.
FACTS
Sometime prior to the accident, PPG had contracted with Sargent & Lundy, an engineering management firm, to design and coordinate the construction of an additional facility for the generation of electrical power for its plant in Calcasieu Parish. The actual construction was performed by several contracting firms, all under the direction and control of Sargent & Lundy. One of these contracting firms was M. W. Kellogg Company, plaintiff's employer.
*790 On October 10, 1968, construction was more than 80% complete and was described as being in the "punch list stages". On the morning of that day, plaintiff, a fellow pipefitter and a welder had been assigned the task of straightening or "plumbing" a nipple located on top of a water collection tank which was part of the project underway. Upon discovering that the nipple was not "plumb" in its screwed connection, plaintiff ordered the welder to light an acetylene torch to heat the nipple in order that it could be bent into a plumb position.
At the time of this activity, there was water flowing through the tank from the demineralizer system and being discharged into the Calcasieu River. Plaintiff testified that while heating of the nipple was in process, a small flake of metal fell down into the interior of the tank, immediately after which he heard a sizzling noise and an explosion occurred.
As a result of this explosion, plaintiff sustained multiple injuries to his face and head for which this action was instituted.

DEFENSE OF EXCLUSIVE REMEDY
Defendant-appellant, PPG, urges first that plaintiff-appellee's remedy does not lie in tort, but rather this action is one in which workmen's compensation is the exclusive remedy.
LSA-R.S. 23:1061 provides, in part:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; . . . . ."
If defendant-appellant were found to be a "principal" or "statutory employer" under Section 1061 above, then workmen's compensation would be the exclusive remedy against him, and the action in tort would be barred. LSA-R.S. 23:1032.
We note at the outset that, "The plea of `statutory employer' under the provisions of LSA-R.S. 23:1061, . . . ., is an affirmative plea and the burden of proof is upon the party asserting it. This burden must be discharged by a preponderance of the evidence." James v. Lykes Brothers S. S. Company, 175 So.2d 444 (La.App. 4 Cir. 1965.) See also Young v. First National Life Insurance Company, 159 So.2d 395 (La.App. 2 Cir. 1963).
The court, in Doss v. American Ventures, Inc., 224 So.2d 470 (La.App. 4 Cir. 1969), (writ den.), noted that:
"Whether contracted work is part of the `operation' of the business (as opposed, e. g., to original construction or reconstruction of one of its facilities) has been utilized as a factor in determining whether the work is a part of the business within the meaning of Section 1061 in Horrell v. Gulf & Valley Cotton Oil Company, 15 La.App. 603, 131 So. 709, and was emphasized as a determining factor in Finn v. Employers' Liability Assurance Corporation, La.App., 141 So.2d 852, 869. * * *."
So, the distinction that has been drawn is this: ordinary maintenance and repairs are part of an employer's regular business, trade or occupation, and construction of a new facility or complete reconstruction of an existing facility are not part of an employer's regular business, trade or occupation.
*791 We elaborated recently on this distinction in Frey v. Brown, 254 So.2d 491 (La.App. 3 Cir. 1971), where we stated that:
"Both Ball v. Kaiser Aluminum & Chemical Corporation, supra, [112 So.2d 741 (La.App. 1959)] and Moak v. Link-Belt [Co.], supra, [229 So.2d 395 (La.App. 1969)] relied upon by plaintiff involved new construction or reconstruction of the principal's facility and because this involved new construction or reconstruction the court held that the employees of subcontractors so engaged could sue the principal in tort. In neither case was it shown that the principal was normally engaged in the business of construction or reconstruction of its facilities and therefore its liability to injured employees of subcontractors was not limited to workmen's compensation under LSA-R.S. 23:1061. This is not the case here. Plaintiff admittedly was in the process of repairing the laydown machine, which operation we have determined is an integral part of Comet's occupation of operating drilling rigs. * * * Plaintiff's sole remedy against Comet is under the Louisiana Workmen's Compensation Act."
However, defendant  appellant PPG, argues that it is no longer the law that an employer must be in his regular trade, business or occupation in order to restrict an employee's rights to recovery under workmen's compensation. To support this argument, PPG cites the recent case of Gray v. Louisiana Power & Light Company, 247 So.2d 137 (La.App. 4 Cir. 1971) (cert. den. 259 La. 59, 249 So.2d 202 (1971)). It is contended that this case should be interpreted as meaning that anything authorized by the articles of incorporation of a business is equivalent to an employer actually being in that trade, business or occupation for purposes of bringing the case under LSA-R.S. 23:1061. The Restated Articles of Incorporation of PPG provide that one of the purposes of the corporation is "to engage in building construction, as contractor or otherwise".
We feel that while it may be inferred from the Gray case, supra, that an important factor in determining what the trade, business or occupation of a corporation is, is whether particular work is specifically authorized by the charter of the corporation, that case did not abolish the traditional requirement that the work being done should be a part of the regular trade, business or occupation of the corporation in order for LSA-R.S. 23:1061 to apply. In fact, the court in that case specifically found that the work being done was "an integral and a necessary part of the regular trade, business or occupation" of the corporation which contracted for the work.
Our reading of the Gray case, supra, indicates that nothing is said in the opinion which would abolish or alter the distinction which we have drawn in the past between ordinary repairs or maintenance and new construction.
There is no question that the work which was being done in the instant case was the completion of new construction of an additional facility for PPG. It was in no way a tie-in or a cut-in to previously existing facilities of PPG. Therefore, we find that this construction was not a part of the regular trade, business or occupation of PPG.
Consequently, we find no error in the jury's verdict that the work being performed by plaintiff was not under the provisions of LSA-R.S. 23:1061, and that plaintiff was entitled to bring this action in tort.
CAUSE OF THE EXPLOSION
The parties in this action called as witnesses two experts in the investigation of explosions. Witness for plaintiff was Cecil Shilstone, while defendant PPG's expert was Frank Weaver.
Mr. Shilstone concluded that methane gas was the cause of the explosion. Mr. Weaver concluded that the ignition of acetylene was the cause. Their testimony does not appear to be reconcilable.
*792 The factors which indicate that methane caused the explosion are:
There is no dispute that methane was present in the water in the tank which exploded. Both experts agreed that methane would evolve from the water in the bottom of the tank and rise in the air inside the tank. Both also agreed that it would theoretically take about four days for methane to accumulate in an enclosed tank of similar size in an explosive ratio. Water had been flowing through the tank for approximately sixteen days prior to the accident. Methane could only escape from the tank through six inch and two inch openings on top of the tank. Mr. Shilstone concluded that the tank was "poorly ventilated". After examining photographs of the tank, blueprints of the water demineralization system, laboratory analyses and data, and the facts above, Mr. Shilstone concluded that methane was the cause of the explosion.
The facts which indicate that methane did not cause the explosion are:
There had never been a prior methane explosion in Southwest Louisiana, despite the presence of methane in all of the water of that part of the state. Mr. Weaver testified that with the openings in the tank, it was not possible for sufficient pressure to build up to cause a methane explosion. The nipple which took the full force of the explosion had been heated several minutes with no explosion. Mr. Weaver also concluded that methane was not the cause because neither the stub pipe nor the manway on top of the tank was damaged, and these were likely places for methane to accumulate.
However, Mr. Weaver appears to have been discredited on this last point, for on cross-examination, he testified that damage would not have occurred at those two points because any methane concentration there would have been too "rich" to explode.
Mr. Weaver was hired by PPG immediately after the explosion as an investigator. After a personal investigation, he concluded that acetylene caused the explosion. However, his testimony on this point was controverted by a showing that he did not examine any sources of acetylene, and he knew of no leakages of acetylene. Mr. Weaver stated that acetylene has a smaller specific gravity than air and rises in air, but the acetylene would have had to enter the top of the tank and descend into the air in sufficient quantity to form an explosive ratio under Mr. Weaver's theory.
The only explosive gas actually proved to be inside the tank which exploded was methane. Mr. Shilstone used sound reasoning and scientific method in arriving at his conclusion that methane caused the explosion. We see no manifest error in the jury's acceptance of his conclusion.
NEGLIGENCE OF PPG
There is no question that the agents and employees of PPG had full knowledge of the presence of methane gas in the water. The evidence also indicates that PPG knew of the potentially hazardous accumulation of methane in this area. PPG itself introduced into evidence governmental studies describing the "explosion hazard" created by methane in "poorly ventilated air spaces." This hazard apparently had been the subject of discussion prior to the explosion among PPG personnel.
PPG contends that the admission into evidence of two memorandums which were introduced by plaintiff over objection constitutes reversible error. The memorandums were written by Everett L. Cook, superintendent of power and utilities at PPG, in October, 1962. These interdepartmental documents were written by Mr. Cook to warn authorities at PPG that he had found a dangerous and possibly explosive mixture of methane in the air spaces of two water wells which were partially ventilated. Mr. Cook was not qualified as an expert witness in this field.
*793 The relevance of the information contained in the memorandums is clear. They have probative value in showing prior knowledge of PPG of the physical properties of methane, and the manner in which it could constitute a hazard.
However, the pertinent question here is whether the opinions and conclusions by a non-expert witness were unfairly prejudicial to PPG. In view of PPG's own introduction into evidence of the U. S. Geophysical Survey report showing the possible "explosion hazard" created by methane in "poorly ventilated air spaces", we feel that the admission of Mr. Cook's memorandums constituted harmless error and did not unfairly prejudice PPG.
Since we have found that PPG knew of the existence of methane and its potential hazard prior to the accident, we now must consider whether PPG is guilty of any negligence which was the proximate cause of the explosion.
LSA-C.C. Article 2317 provides, in part:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by . . . the things which we have in our custody * * *."
At the time of the explosion, PPG had legal custody and ownership of the tank. Article 2317 does not impose absolute liability for damage caused by one's property, but rather a presumption of negligence. It is then the burden of the property owner to rebut this presumption. Dupre v. Travelers Insurance Company, 213 So.2d 98 (La.App. 1 Cir. 1968); and Jones v. Shell Petroleum Corporation, 185 La. 1067, 171 So. 447 (1936).
Plaintiff contends that PPG failed to inform or warn either Sargent & Lundy or M. W. Kellogg Company or their employees of the potential hazard caused by methane in the tank which exploded.
Defendant PPG contends that on one occasion Earl Connor, an employee of M. W. Kellogg Company, was warned of the presence of methane in water wells and told to get a permit before cutting a two inch line. We do not see how this prior notification on a specific job relieves PPG of its duty to warn of the methane hazard involved in the tank which exploded in the instant case. Rather, since this prior action in a specific case was not a general warning, it could well have led M. W. Kellogg Company or its employees to believe PPG would warn them of other hazardous places where work was being completed.
We find that PPG legally owned and had custody of the property which caused plaintiff's injuries. PPG failed to warn plaintiff or his superiors of the potential methane explosion hazard on its property here involved. Thus, we find no error in the jury's verdict that PPG's negligence was the proximate cause of the explosion and the injuries sustained by plaintiff.
NEGLIGENCE OF SARGENT & LUNDY, M. W. KELLOGG AND THEIR EMPLOYEES
Defendant PPG urges that if it is found negligent then Sargent & Lundy, M. W. Kellogg Company and their employees, including plaintiff, should also be found negligent for violating the following rule of PPG's Contractor's Safety Handbook:
"1. Do no cutting or welding until all fire hazards have been removed or adequate fire fighting equipment is at hand. When in doubt as to fire hazard, check with the Field Engineer. * * *.
"7. Check with supervisor to see if permit required."
Closer examination of these rules, however, indicates that the foregoing provisions apply specifically to existing facilities of PPG. There is no requirement for a special permit to do such work on items classified as new construction. Further, *794 the Safety and Security Director for PPG, Murray Davis, testified that he did not consider this tank a fire hazard, that it was not covered by the above rules, and that he did not think any test was required on the tank which exploded.
We find no preponderance of evidence establishing negligence by parties other than PPG. Therefore, there was no manifest error in the jury's verdict absolving all other parties of negligence.
DAMAGES
PPG urges us to find that the damages awarded plaintiff in the amount of $172,000.00 were excessive.
The explosion in this case caused severe injuries to plaintiff. His face and the right side of his head were crushed. Soft tissues of the nose, lips, mouth, and face were avulsed. Nerves in his right cheek were destroyed causing lack of expression on that side, droopiness of his mouth, and slurring of speech. Saliva and food fall from the right corner of his mouth. His jawbone received compound fractures in three places. His right cheekbone was crushed. It was necessary for plaintiff to undergo numerous operative procedures to sew his face together, to repair the multiple fractures, to attempt cosmetic repairs, and to repair his dental arches. These procedures stretched over many months, requiring numerous trips to Houston, New Orleans, Lafayette, and Opelousas for treatment, consultation and surgery.
Despite the prolonged medical efforts, plaintiff remains disfigured, and will likely be so for life. The physical pain and suffering that he endured over a long period is obvious. Dr. William P. Cloyd, one of the treating physicians, was of the opinion that the plaintiff was totally disabled from working for the rest of his life. This disability results from his severe depression reaction and social withdrawal. Dr. Cloyd felt that the emotional and psychological harm, as well as the physical injuries to plaintiff was permanent.
Although there was some conflicting medical testimony in this case, we have often held that the testimony of a treating physician is entitled to great weight. There is no manifest error in the acceptance of Dr. Cloyd's opinion by the jury.
Turning to the amount of the sum awarded by the jury, we note that the verdict was for a lump sum of $172,000.00, and it is impossible to determine the precise amount awarded for medical expenses, lost earnings, and mental and physical pain and suffering.
At the trial, actual medical expenses of $18,975.21 were proved. Lost earnings to the date of trial were $23,936.00. There is little doubt that the jury properly included these amounts in their verdict.
Plaintiff called as a witness W. E. Groves, an expert actuary. Mr. Groves calculated that, on an actuarial basis, the present value of future loss of earnings to the plaintiff through his work life expectancy was $54,143.00.
PPG argues that Mr. Groves erred in failing to consider and adjust for withholding or FICA taxes to determine the value of lost earnings. We find no merit in this contention. The gross salary, wages, or earnings must be considered in these calculations. Menard v. Travelers Insurance Company, 240 So.2d 390 (La. App. 3 Cir. 1970); and Adams v. Allstate Insurance Company, 212 So.2d 204 (La. App. 4 Cir. 1968) (writ den. 252 La. 888, 214 So.2d 716).
PPG also argues that it was error to disregard plaintiff's change in marital status since the injury, his qualification for social security benefits, and his exemption from taxes on the award. We find no error in disregarding these factors and no authority requiring their consideration.
PPG also argues that Mr. Groves should have considered more than the two immediate preceding years in determining *795 plaintiff's income. However, Mr. Groves testified as an expert actuary and indicated that the last two years of earning capacity provide the best indication of a person's ability to earn thereafter. We therefore see no manifest error in the jury's acceptance of his testimony, or in a finding that the present value of future loss of earnings to plaintiff through his work life expectancy was $54,143.00.
The total of the amounts enumerated above for medical expenses and past and future loss of earnings is $97,054.21. We have found that it was reasonable for the jury to include such an amount in their verdict.
The remaining part of the $172,000.00 award is $74,945.79. We thus proceed to a consideration of whether $74,945.79 is an excessive award for the pain and suffering involved here. In describing the injuries and medical treatment of plaintiff, we have already pointed out the great extent of his pain and suffering.
We begin our review by noting that our Supreme Court has decreed in Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), that unless there is a complete similarity between injuries in different cases, an award must be tested by "the facts and circumstances peculiar to the case under consideration."
This Court has stated two general guidelines to follow in reviewing the amount of awards: (1) Much discretion must be left to the trial judge or jury in the assessment of damages for tort; and (2) appellate review of the quantum of an award should be limited to a consideration of whether this discretion has been abused. LSA-C.C. Article 1934(3); Knotts v. Employers Casualty Company, 177 So.2d 630 (La.App. 3 Cir. 1965), and numerous cases cited therein.
With these guidelines in mind, we note the following cases which we feel contain pertinent similarities to the instant case.
In Knotts v. Employers Casualty Co., supra, we affirmed an award of $45,000.00 to plaintiff for facial scarring. Plaintiff was a young woman who had won or placed in several beauty contests. Her face was scarred for life, and it was shown that plastic surgery would do no good. In the instant case, plaintiff was not a beauty contest winner, but rather a man in his late fifties. However, he was disfigured for life after plastic surgery and cosmetic repairs taking many months. He suffered not only facial scarring, but also numerous fractured bones and dental destruction.
The Court, in Jones v. Aetna Casualty and Surety Company, 198 So.2d 523 (La. App. 2 Cir. 1967) (cert. den. 250 La. 930, 199 So.2d 926 (1967)), held that an award of $95,000.00 for soft tissue injury involving disfigurement of the face was excessive, and should be reduced to $50,000.00. In the case before us, plaintiff suffered not only soft tissue injury, but also fractures of every bone in his face and other injuries. Plaintiff here appears to have suffered greater damages than plaintiff in the Jones case, supra.
In a reecnt decision, our Supreme Court held that an original jury award of $60,000.00 to a plaintiff who sustained painful injuries resulting in more than 100 sutures being taken in her face, leaving her with permanent facial disfigurement and necessitating future plastic surgery, was within the jury's discretion, and reduction of the award to $25,000.00 was erroneous. The Court stated, "The jury in the present case had the advantage of seeing the disfigurement and appraising it in connection with the medical testimony." Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971).
The facts and circumstances peculiar to the case under consideration, and in comparison with the cases discussed above, *796 indicate that the jury here did not abuse its discretion if it awarded plaintiff $74,945.79 for pain and suffering. The jury here observed the disfigurement firsthand, heard the medical testimony, and considered the numerous other injuries sustained. We hold that the award of $74,945.79 for pain and suffering is not manifestly excessive.
We have found that plaintiff here is entitled to $18,975.21 for actual medical expenses, $23,936.00 for lost earnings to the date of trial, $54,143.00 for future loss of earnings through his work life expectancy, and $74,945.79 for pain and suffering. Therefore, we find no manifest error in the jury's award of $172,000.00 to plaintiff, and affirm that verdict.
Finally, counsel for PPG urges that, "The court erred here in asking the jury to make a special finding as to the amount due the intervenor. This had the effect of increasing the award and was unnecessary since the intervenor collects his claim automatically out of any award made plaintiff." We agree that the intervenor, Travelers Insurance Company, should collect its claim for $23,840.21 paid to plaintiff in workmen's compensation benefits out of the award to plaintiff, and in priority to plaintiff. Therefore, to the extent that the judgment below does not reflect this opinion, it is amended.
For the foregoing reasons, we affirm the trial court's judgment granting recovery in favor of plaintiff, and against defendant PPG, in the sum of $172,000.00 with the amendment that the sum of $23,840.21 awarded to the intervenor shall be paid out of the award of $172,000.00, and to the intervenor in priority to the plaintiff. We further affirm the trial court's judgment in favor of all other original defendants to this action.
All costs of this appeal will be assessed to appellant, PPG.
Amended and affirmed.